IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 22, 2015

**STATE OF TENNESSEE v. JOSEPH SANFORD McNAIR, JR.**

**Appeal from the Criminal Court for Knox County**
**No. 94084    Bob R. McGee, Judge**

**No. E2014-00916-CCA-R3-CD-FILED-FEBRUARY 25, 2015**

The Defendant, Joseph Sanford McNair, Jr., was convicted by a Knox County Criminal Court jury of possession with the intent to sell more than 0.5 grams of cocaine in a drug-free zone, a Class B felony, possession with the intent to deliver more than 0.5 grams of cocaine in a drug-free zone, a Class B felony, and possession of marijuana, a Class A misdemeanor. *See* T.C.A. §§ 39-17-417(a)(4) (2010) (amended 2012, 2014) (possession with intent to sell and to deliver), 39-17-432 (2014) (drug-free school zone), 39-17-418 (2010) (amended 2014) (possession of marijuana).  The trial court merged the possession with the intent to deliver cocaine conviction with the possession with the intent to sell cocaine conviction and sentenced the Defendant to twelve years' confinement.  The court ordered concurrent service of eleven months and twenty-nine days for the marijuana possession conviction.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction for possession with the intent to sell more than 0.5 grams of cocaine and (2) the court erred by denying his motion to suppress evidence.  We affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

J. Liddell Kirk (on appeal and motion for new trial) and Cameron D. Bell (at trial), Knoxville, Tennessee, for the appellant, Joseph Sanford McNair, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Randall E. Nichols, District Attorney General; and Sean F. McDermott and Joanie Stewart, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the seizure of approximately 36 grams of crack cocaine during a police encounter with the Defendant. At the trial, Knoxville Police Officer Brian Baldwin testified that on December 8, 2009, at 1:30 p.m., he and Officer Brandon Stryker were parked in their respective police cruisers at the corner of Minnesota and Sherman Avenues near a park when he saw an Oldsmobile with very dark windows traveling eastbound. The entire front windshield was tinted. Officer Baldwin followed the Oldsmobile and saw it turn left into a residence on Minnesota Avenue, and he "pulled [his] police car all the way in." Officer Stryker parked his police cruiser beside Officer's Baldwin's police cruiser. As Officer Baldwin exited his car, the Defendant exited the driver's door of the Oldsmobile. Officer Baldwin and the Defendant made eye contact, and the Defendant removed a leather jacket he was wearing, placed it inside the car, and closed the door. The Defendant walked toward Officer Baldwin, and Officer Baldwin identified himself and told the Defendant he stopped him because of excessive window tint. The Defendant was unable to provide identification, and Officer Baldwin went to his cruiser to verify the Defendant's identity while Officer Stryker remained with the Defendant.

Officer Baldwin testified that he returned to the Defendant and Officer Stryker and that he asked the Defendant if anything illegal was inside the car and requested permission to search the car. The Defendant consented to a search of the car, unlocked the passenger-side door, and offered to unlock the trunk. During the search, Officer Baldwin found two bags of what he believed was crack cocaine and one bag of marijuana inside a pocket of the leather jacket the Defendant removed previously. He placed the Defendant under arrest and continued the search. Inside the trunk, Officer Baldwin found digital scales with what he believed was cocaine residue. Officer Baldwin said the Defendant did not display any signs of being a cocaine user and was not intoxicated, and he did not request the Defendant perform field sobriety tests. He found no pipes, syringes, or other paraphernalia used to ingest crack cocaine inside the car.

Officer Baldwin described photographs taken at the scene, which depicted the Oldsmobile, the crack cocaine, the marijuana, the scales, and the leather jacket. Relative to the photograph of the car driven by the Defendant, Officer Baldwin noted that Sam E. Hill Preschool was in the background. Officer Baldwin weighed the crack cocaine at the scene, and a photograph of the police-issued scales showed a total weight of 36.2 grams. Officer Baldwin weighed the marijuana at the scene, and a photograph of the police-issued scales showed a total weight of 1.9 grams. A photograph of the scales found inside the trunk showed a white residue. Another photograph showed $233 in cash in the Defendant's possession. Another photograph showed a comparison between the car door window tint and

the state-issued tint card. Officer Baldwin stated that he measured the distance between the Defendant's car and the preschool property, which was 74 feet.

On cross-examination, Officer Baldwin testified that he overheard the Defendant talking to Officer Stryker about going inside the residence and that he learned at the suppression hearing that Officer Stryker and the Defendant entered the residence. He agreed nothing illegal was found inside. He agreed Aaron Roper was the registered owner of the car. He identified photographs of the police department's arrest report and the general property, currency, and narcotics envelopes. He acknowledged that at the preliminary hearing, he stated the incorrect address, that a clerical error was made relative to the address, and that the error was corrected on the day of the Defendant's arrest.

On redirect examination, Officer Baldwin testified relative to the address of the residence that he made a clerical error when he completed the envelopes and that the error was corrected on the day of the Defendant's arrest. Relative to the where his police cruiser was parked, he stated he was parked between Texas and Minnesota Avenues.

Knoxville Police Officer Brandon Stryker, an expert in the field of drug trafficking investigations, testified that on December 8, 2009, he and Officer Baldwin were parked in their respective police cruisers near Brittany Daniels Park at the intersection of Sherman and Minnesota Avenues. He observed the car driven by the Defendant turn onto Minnesota Avenue and said that Officer Baldwin followed the car and that he followed Officer Baldwin. Officer Baldwin stopped the car, and Officer Stryker provided assistance. Officer Stryker said the Defendant parked the car at 1715 Minnesota Avenue.

Officer Stryker testified that the Defendant consented to a search of the car. Officer Stryker identified the white substance found inside the car as crack cocaine. He said the two large chunks of crack cocaine found were known as a "crack cookie." He believed the crack cocaine had been made in a Pyrex measuring cup because of its shape. He said crack cocaine was commonly sold in small pieces weighing about 0.2 grams and valued at $20. He agreed the crack cocaine found inside the Defendant's jacket weighed 36.2 grams, and he stated that amount could produce about 181 doses of 0.2 grams and had a "street" value of $3620. He explained that crack cocaine was usually smoked using a "crack pipe" and said no pipe was found in the Defendant's possession or inside his car.

Officer Stryker testified that the toxicology report showed the crack cocaine weighed 35.9 grams. He explained that a portion of the substance was used by analysts for identification purposes and that water contained in the crack cocaine evaporated over time causing the substance to weigh less. He said a small difference between the field-test weight and the weight at the laboratory was common.

Officer Stryker testified that at the scene the Defendant claimed he was between jobs. Officer Stryker identified Sam E. Hill Preschool in photographs taken at the scene and said he and Officer Baldwin measured the distance between the Oldsmobile and the preschool property, which was 74 feet. He explained that the crack cocaine was white at the scene but yellow at the time of the trial because of the continuation of a chemical reaction.

On cross-examination, Officer Stryker testified that he believed the Defendant had the intent to sell the crack cocaine because no items used to ingest it were found inside the car and because the Defendant possessed a large amount. He agreed someone who was selling drugs needed some type of packaging for distribution and said no "plastic baggies" were found during the search. He agreed the Defendant possessed a minimal amount of marijuana and did not possess any paraphernalia used to ingest it. He said the Internet system "KGIS" describing real property in Knox County showed the address of the residence was 1715. He agreed that the digital scales were found in the trunk and that the car was owned by Aaron Roper.

On redirect examination, Officer Stryker testified that he was familiar with the signs of drug addiction and said the Defendant did not display any of those signs. He said he had never seen "a crackhead" possess 36.2 grams of crack cocaine.

Tennessee Bureau of Investigation (TBI) Special Agent Sharon Norman, an expert in forensic chemistry, testified that she analyzed the substances in this case. She concluded that the white, rock-like substance contained cocaine base and weighed 35.9 grams. Regarding the color change of the crack cocaine, she explained that the chemicals used to process the crack cocaine changed over time into a yellow color. She also said that if the crack cocaine were not dried fully before being placed in a bag, the degradation might be greater than had the substance been dried fully. During her analysis, she used a small portion of the substance. Relative to the plant material, she concluded that the substance was marijuana and weighed 0.8 grams.

On cross-examination, Agent Norman testified that the crack cocaine was contained in one plastic bag. She said her analysis did not show what percentage of the substance was cocaine and explained the TBI laboratory did not perform purity analyses. On redirect examination, she agreed a purity analysis was not required by law.

The Defendant testified that he was not a drug dealer and that he had never sold drugs, although he had purchased drugs. He said that on December 8, 2009, the police stopped him after he arrived at Kevin Thronberg's residence on Minnesota Avenue. He said Jay Rock asked him to pick up the Oldsmobile and drive it to Mr. Thronberg's residence because Mr. Rock was incarcerated and because Mr. Rock's girlfriend was moving and did not want the

car towed. He denied previously driving or being inside the car and said he did not inspect the car before driving it. He denied owning the scales found inside the trunk and knowing the scales were there.

The Defendant testified that although he was employed at the time of the trial, he was only "working . . . jobs from here to there" at the time of his arrest, including concrete-related work and cooking at a restaurant. In 2009, he lived with his fiancée, who supported him.

The Defendant admitted he possessed about one ounce of crack cocaine on the day of his arrest. Regarding the large amount, he stated that sometimes the quality of crack cocaine was poor and that he needed a larger amount to "get a good high[.]" He said he paid about $400 for it on the day of his arrest. He denied that he would have paid more if the crack cocaine would have been divided into "little tiny quantities." He said he paid for the crack cocaine with money provided to him by his father. He said he bought the crack cocaine from someone he knew as "C. Bone" about ten minutes before the officers stopped him. He met C. Bone to obtain the drugs at the location where he picked up Mr. Rock's car. He said that he intended to "get[] high" with the crack cocaine but that the items he planned to use to ingest it were inside the residence where the police stopped him.

The Defendant testified that he had purchased crack cocaine fifteen times previously and that the largest quantity he had purchased was worth about $280 to $290. He said that the quality of the drugs he bought on December 8 was poor and that the drugs would have lasted him about one day. He said he stopped using drugs in 2009 because his drug use hurt his family.

On cross-examination, the Defendant testified that he was driving the Oldsmobile, that the police stopped him when he was in the car, that he parked the car at the location identified by Officers Baldwin and Stryker, and that he was wearing a leather jacket, which he removed and placed inside the car. The Defendant agreed that Sam E. Hill Preschool was nearby and identified the preschool's swings and jungle gym in a previously admitted photograph. Although the Defendant did not know the distance between the car and the preschool, he agreed the distance was within 1000 feet. The Defendant admitted that he possessed the crack cocaine and that it was a large amount. He said he had no reason to dispute the crack cocaine weighed 36 grams. However, he denied ownership of the marijuana. He did not know the origin of the marijuana, although he admitted the leather jacket in which it was found was his.

The Defendant explained how he consumed crack cocaine. He said usually a crack pipe had a hole on each end. He said he placed crack cocaine and a piece of "copper brillo" in the hole on one end, used a lighter to heat the drugs, and smoked from the other end. He

said that pipes varied in size and that the amount of crack cocaine used depended upon the size of the pipe. He agreed he would have had to break down the amount found in his possession several times in order for it to fit inside a pipe. He said "a twenty" was an amount of crack cocaine equivalent to the size of a pinky fingernail.

The Defendant testified that he and C. Bone arranged their December 8 meeting on December 7. He said that he told C. Bone that he had $400 to spend on crack cocaine, that C. Bone did not have enough crack cocaine that day, and that C. Bone told him to call the next day. He said C. Bone determined the quantity. He said good quality crack cocaine was not white or clear. When asked why he permitted Officer Stryker to enter the residence, he said that the officer wanted to go inside and that all the drug paraphernalia was hidden. He did not recall telling Officer Stryker that he came to the residence for work.

On redirect examination, the Defendant testified that several years had passed since his arrest and that it was possible he did not remember every detail. He said that the quality of the crack cocaine he possessed required "about five hits" for an adequate high but that good quality crack cocaine required less. He said he planned to consume the crack cocaine with his friends but denied he planned to sell it to them. On recross-examination, he stated that all crack cocaine users shared their drugs. He said he usually handed the pipe to his friends after he took the first hit, but he denied he was delivering crack cocaine to another person and equated it to "casual exchange."

Officer Stryker testified on rebuttal for the State that he had never worked a case in which 36 grams of crack cocaine was purchased for $400. He said that during one of his recent cases, the police purchased about 6 grams for $225. He estimated that $400 would purchase 11 grams of crack cocaine. Relative to the Defendant's claim that the poor quality of the crack cocaine resulted in a low price, Officer Stryker stated that he had never seen such a transaction on the streets. He concluded, based on his expert opinion, that the crack cocaine found in the Defendant's possession had a value of $3600 if sold as "individual hits." He stated that even if the drugs were sold at a bulk discount, the price would significantly exceed $400. He said he had never heard of anyone consuming 36 grams of crack cocaine in one day. He said crack cocaine users usually only possessed 1 gram at a time. Although he could not determine whether a person who consumed 36 grams of crack cocaine in one day would survive, he concluded that a person would have to be a chronic user over several years to consume that much in one day. He said someone who had been using drugs for two months was not a chronic user. He denied seeing any drug paraphernalia inside the residence.

On cross-examination, Officer Stryker testified that he did not search drawers or cabinets inside the residence and that it was possible paraphernalia was hidden from plain view. He defined a regular cocaine user as an addict who possessed drug paraphernalia, including a pipe, at all times and who smoked the drug immediately after purchasing it. He agreed it was possible that the crack cocaine in this case had a substantially poorer quality than crack cocaine he had encountered previously. On redirect examination, he stated that he had participated in more than 100 controlled buys of crack cocaine and that none of those controlled buys involved 36 grams for $400. On recross-examination, he admitted he did not know the purity level of the crack cocaine in those controlled buys.

Upon this evidence, the Defendant was convicted of possession with the intent to sell and to deliver more than 0.5 grams of cocaine in a drug-free zone and possession of marijuana. The trial court merged the possession with the intent to deliver cocaine conviction with the intent to sell cocaine conviction and sentenced the Defendant to an effective twelve-year sentence. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions relative to the crack cocaine. He does not contend that the evidence is insufficient to support his conviction for possession of marijuana. In his brief, he concedes that he was in possession of the of crack cocaine within 1000 feet of a preschool. His argument, rather, is that he possessed the crack cocaine for personal use and cites to his trial testimony as evidence supporting his position. The State responds that sufficient evidence established the Defendant's intent to sell or deliver the cocaine. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

It is a crime to "[p]ossess a controlled substance with intent to . . . deliver or sell [a] controlled substance." T.C.A. § 39-17-417(a)(4). Delivery is defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." *Id*. § 39-17-402(6) (2014). A sale is "a bargained-for offer and acceptance, and an actual or constructive transfer or delivery" of the substance. *State v. Holston*, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002). Possession of cocaine with the intent to sell or to deliver is a Class B felony "if the amount involved is point five (.5) grams or more[.]" T.C.A. § 39-17-417(c)(1) (2010) (amended 2012, 2014).[1]

Because the Defendant concedes in his brief that he possessed the crack cocaine within 1000 feet of a preschool, our review is limited to whether sufficient evidence exists showing that the Defendant intended to sell or to deliver the crack cocaine. The evidence in the light most favorable to the State reflects that during the Defendant's encounter with the police, the Defendant displayed no indications of addiction or that he used crack cocaine. Officer Baldwin testified that the Defendant did not appear intoxicated and that he did not request the Defendant to perform field sobriety tests. Officer Baldwin did not find any drug paraphernalia on the Defendant or inside the car, and Officer Stryker, an expert in drug trafficking investigations, testified that most drug users smoked crack cocaine with a pipe immediately after the purchase and possessed their pipe at all times. Officer Strkyer concluded that the cocaine was not for personal use and that the Defendant intended to sell or to deliver the crack cocaine based on the large amount of crack cocaine and because no paraphernalia was found during the search. We note that digital scales with a white residue were found inside the trunk of the car.

Relative to the large amount of crack cocaine in the Defendant's possession, Officer Stryker testified that the crack cocaine had an approximate value of $3600 and could produce about 181 individual 0.2 gram doses. He had never seen a regular drug user possess 36 grams of crack cocaine and said that none of the 100 controlled drug buys in which he had participated involved a purchase of 36 grams for only $400. Although the Defendant testified that he intended to consume the crack cocaine and that the poor quality required him to consume a larger amount of crack cocaine to obtain the desired effect, the jury's verdict

---

[1] We note that although the indictment and the judgment forms reflect that the amount of cocaine was more than 0.5 grams, our statutes define the relevant quantity as "point five (.5) grams or more[.]" *Id.*

-8-

reflects that it discredited his testimony. *See Bland*, 958 S.W.2d at 659. Likewise, the verdict reflects that the jury discredited the Defendant's testimony that he intended to consume all of the crack cocaine inside the residence that day and that his pipe was hidden from plain view inside the residence. Officer Stryker testified that he had never heard of anyone consuming such a large amount of crack cocaine in one day and expressed concern about the health risks associated with that level of consumption. He noted that a crack cocaine user only possessed about 1 gram at a time. We conclude that the evidence is sufficient to support the Defendant's possession with the intent to sell and to deliver more than 0.5 grams of cocaine convictions. He is not entitled to relief on this basis.

## II

### Motion to Suppress

The Defendant contends that the trial court erred by denying his motion to suppress the evidence seized during the traffic stop. He argues that Officer Baldwin did not have a legal basis to stop the him because the time in which Officer Baldwin observed the window tint on the car was insufficient to establish probable cause of a window tint violation. The State responds that the court properly denied the motion to suppress. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

Although the Defendant raised several issues in his motion to suppress, his issue on appeal is limited to whether the police had a legal basis to initiate a stop. He does not raise an issue relative to the search of the vehicle after the initial stop, which resulted in the seizure

of the evidence presented at the trial. As a result, our recitation of the testimony at the suppression hearing is limited to whether the police properly initiated the stop.

At the suppression hearing, Knoxville Police Officer Brian Baldwin testified that he was on patrol when he saw the vehicle being driven by the Defendant. The front windshield was extremely dark and Officer Baldwin could not see through the windshield. He initiated a traffic stop based on the dark-tinted window. The Defendant was backing into a gravel area when the officer initiated the stop. The Defendant and Officer Baldwin each exited their respective vehicles, and Officer Baldwin approached the Defendant. Officer Baldwin explained that he stopped the Defendant for a window tint violation and requested the Defendant's identification. The Defendant did not have identification, and Officer Baldwin's investigation showed that the Defendant had a suspended license and that the license plate on the car was registered to a different vehicle.

Officer Baldwin identified a December 8, 2009 photograph of the front windshield of the car and stated that the dark window tint on the windshield prevented anyone from seeing inside. Officer Baldwin stated that he believed the windshield violated the window tint law.

On cross-examination, Officer Baldwin testified that he made the decision to initiate a stop based on the dark window tint. He agreed Officer Stryker participated in the stop because he was in the area and provided backup. Officer Baldwin stated that he observed the car traveling from his left, that he obtained a full view of the front of the car, and that he observed the car for about one or two seconds. When asked how he knew the windshield violated the window tint law, he replied, "[W]hen you can't see through a vehicle, it's pretty evident that the window tint is too dark." He noted that the photograph of the windshield also showed other vehicles and said that he could see through the windows of the other vehicles. He said there was "a factory line" relative to the amount of tint for a front windshield and that the tint could not extend below the factory line. He said he had previously cited other drivers for violating the window tint statute.

Officer Baldwin testified that although he carried a state-issued tint card, the windshield tint was extremely dark and illegal. He also said the manner in which the card was used to determine whether window tint was too dark did not apply to windshields. He used his observation skills to determine that the tint was "past the point where it should've been."

The trial court found that Officer Baldwin observed the car driven by the Defendant on a public roadway with the windshield tint "much darker than the legal limit." The court credited Officer Baldwin's testimony that the windshield tint was "obviously too dark." The

court found that the photograph of the windshield corroborated the officer's testimony regarding the tint. The court noted that the photograph clearly showed the Defendant was operating a vehicle with a windshield tint substantially darker than the windshields of the surrounding vehicles because the court could see inside the surrounding vehicles but not inside the vehicle driven by the Defendant. The court found that as a result of the dark tint, Officer Baldwin had sufficient cause to initiate a stop.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection against unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7. As a result, warrantless searches and seizures are presumed unreasonable, and evidence obtained as a result is "subject to suppression unless . . . the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997); *see Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). A traffic stop "constitutes a 'seizure' within the meaning of our federal and state constitutions." *State v. Berrios*, 235 S.W.3d 99, 105 (Tenn. 2007) (citing *Mich. Dep't. of State Police v. Sitz*, 496 U.S. 444, 450 (1990); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993)). A police officer is permitted to initiate a traffic stop without a warrant when the officer "has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *Bridges*, 963 S.W.2d at 492; *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968); *State v. Yeargan*, 958 S.W.2d 626, 630 (Tenn. 1997); *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

The record reflects that Officer Baldwin observed the Oldsmobile driven by the Defendant on a public roadway for one or two seconds, saw that the front windshield was extremely dark, and was unable to see inside the car because of the window tint. In Tennessee, it is unlawful to "operate, upon a public highway, street or road, any motor vehicle in which any window . . . has a visible light transmittance of less than thirty-five percent (35%); or with the exception of the manufacturer's standard installed shade band, reduces the visible light transmittance in the windshield below seventy percent (70%)." T.C.A. § 55-9-107(a)(1)(A), (B) (2012). The photograph received as an exhibit at the suppression hearing shows that the front windshield was tinted to the extent that it prevented any visibility inside the car, and the trial court properly found that the photograph corroborated Officer Baldwin's testimony that the windshield tint exceeded the legal limit. Officer Baldwin's testimony shows that he obtained a full view of the front of the car and that he observed the car for about one or two seconds. We conclude that the evidence does not preponderate against the trial court's factual findings and that the officer had reasonable suspicion supported by specific and articulable facts that the windshield tint exceeded the legal limit. The trial court did not abuse its discretion by denying the motion to suppress, and the Defendant is not entitled to relief on this basis.

The judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE